UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ROBERT REIFSCHNEIDER,

        Plaintiff,

        v.                                Case No. 18-C-146

DR. THOMAS GROSSMAN et al.,

        Defendants.

## DECISION AND ORDER

Plaintiff Robert Reifschneider, who is incarcerated at the Wisconsin Secure Program Facility and representing himself, filed this action pursuant to 42 U.S.C. § 1983, alleging that his civil rights were violated while he was in custody at Columbia Correctional Institution. In addition to his federal claims under § 1983, Reifschneider also asserted a state medical malpractice claim against Dr. Thomas Grossman over which the court exercised supplemental jurisdiction under 28 U.S.C. § 1367, since it appeared that claim was intertwined with the other claims in the action. The state law medical malpractice claim is currently before the court on Reifschneider's motion for partial summary judgment against Defendant Dr. Grossman and Dr. Grossman's own motion for summary judgment of dismissal. Reifschneider's Eighth Amendment deliberate indifference claims against the state Defendants employed by the Wisconsin Department of Corrections (DOC) are the subject of separate motions for summary judgment which are not yet fully briefed. For the reasons that follow, Dr. Grossman's motion for summary judgment will be granted and Reifschneider's motion for summary judgment will be denied.

**BACKGROUND**[1]

Dr. Thomas Grossman is licensed to practice medicine in the state of Wisconsin as an orthopedic surgeon. Def.'s Proposed Findings of Fact (DPFF), ¶ 2, Dkt. No. 96. He worked for Agnesian HealthCare when he performed an Achilles tendon repair procedure for Reifschneider in December 2014 and when he provided related follow-up care. *Id.* at ¶ 3. During this time period, Dr. Grossman performed about 400 to 500 surgeries a year for inmates who were referred to him by the Wisconsin Department of Corrections. *Id.* at ¶ 4.

Reifschneider was referred to Dr. Grossman for a suspected Achilles tendon injury. *Id.* at ¶ 7. During a physical exam of Reifschneider on December 8, 2014, Dr. Grossman determined that Reifschneider suffered an acute Achilles tendon tear. *Id.* at ¶ 8. Dr. Grossman suggested either closed or open operative treatment for the injury and disclosed the risks to Reifschneider. *Id.* at ¶ 9. He told Reifschneider it was an elective procedure and outlined the risks (including infection, nerve and blood vessel damage, swelling, scarring, bleeding, stiffness, and additional intervention). *Id.* Reifschneider agreed to the surgery and signed a preoperative consent. *Id.* at ¶¶ 10, 13.

Dr. Grossman performed Reifschneider's right Achilles tendon repair procedure on December 11, 2014. *Id.* at ¶ 14. There were no complications. *Id.* During the surgery, Dr.

---

[1] Reifschneider has not responded to Dr. Grossman's proposed findings of fact in accordance with Civil L.R. 56. He claimed that the findings of fact he submitted in opposition to Dr. Grossman's findings of fact were "clearly" his response. Dkt. 109. The court did not receive this filing. If he did prepare such a filing, Reifschneider did not refer to it in his two-page response in opposition to Dr. Grossman's motion for summary judgment, which develops no genuine factual dispute. Dkt. No. 102. In any event, Reifschneider was provided an opportunity to present his version of events with the proposed findings of fact he submitted with respect to his claim of medical malpractice against Dr. Grossman. The court will consider these findings, but will not grant Reifschneider time for an additional response.

Grossman observed a complete tear in Reifschneider's Achilles tendon, about 2.5 cm above its insertion on the calcaneus. *Id.* at ¶ 15. Dr. Grossman describes how he completed the operation:

> I proceeded to debride the ends of the torn tendon, and then utilized core grasping sutures with #5 FiberWire, which I placed in the proximal and distal ends of the torn tendon. I plantarflexed Mr. Reifschneider's foot, and the sutures were tied, resulting in excellent apposition. I then reinforced the repair with #2 FiberWire sutures.

Dkt. No. 97 at 3. FiberWire is the brand name for a "heavy, nonabsorbable surgical suture" used in tendon repairs; the suture becomes permanent once placed on the repaired tendon. DPFF, ¶¶ 16, 18. These sutures are "not designed to dissolve" because they are supposed to be a permanent part of the repaired tendon and are not removed after surgery. *Id.* at ¶ 19. After the surgery was completed, Reifschneider was returned to the care of Dr. Hoftiezer, his medical provider with the DOC. *Id.* at ¶ 23. Dr. Grossman provided postoperative recommendations to Dr. Hoftiezer. *Id.*

On December 22, 2014, Dr. Grossman saw Reifschneider for a postoperative appointment. *Id.* at ¶ 24. Dr. Grossman noted that the incision was benign and Reifschneider received a short leg cast. *Id* at ¶¶ 24–25. Dr. Grossman reviewed with Reifschneider the "possibility" of nerve and blood vessel damage and planned for Reifschneider to return in one year to assess "the nature of any permanency." *Id.* at ¶ 25. The instructions sent back to Dr. Hoftiezer provided for "strict non-weightbearing." *Id.*

On February 12, 2015, Dr. Grossman saw Reifschneider after he was referred to him for follow-up care by Reifschneider's DOC medical providers. *Id.* at ¶ 26. Dr. Grossman observed that the incision was benign, but that Reifschneider may have "some neuropathic pain." *Id.* at ¶ 27. He recommended pain medication (1800 mg of Neurontin per day), physical therapy, and

an Achilles boot starting with six wedges, with one removed per week. *Id.* at ¶ 28. He also recommended a follow-up appointment in eight weeks. *Id.*

Dr. Karl Hoffman, Reifschneider's DOC physician, contacted Dr. Grossman about a wound problem and Dr. Grossman advised prescribing Reifschneider an antibiotic (Bactrim). *Id.* at ¶¶ 29–30. Dr. Grossman saw Reifschneider the following week on March 11, 2015. *Id.* at ¶ 29. According to Dr. Grossman, Reifschneider said that his leg wound was "dramatically better" and that he saw improvement in his foot's lateral aspect sensitivity. *Id.* at ¶ 30. At this exam, Dr. Grossman observed the Achilles tendon repair was intact after performing a calf squeeze test. *Id.* at ¶ 31. Dr. Grossman also noticed a "a centimeter area of granulation tissue without exudate," "some surrounding erythema, but no ascending lymphangitis." *Id.* He advised Dr. Hoffman to continue the Bactrim and begin saline dressing changes every six hours. *Id.* at ¶ 33.

Dr. Grossman examined Reifschneider again on March 25 and April 29, 2015. *Id.* at ¶¶ 35, 38. After the March 25 exam, Dr. Grossman recommended silver nitrate treatment and dry dressing and Neurontin pain medication to Dr. Hoffman for treating Reifschneider's leg. *Id.* at ¶ 36. Dr. Grossman also advised that Reifschneider's leg may require debridement and skin grafting and suggested a follow-up appointment three weeks later. *Id.* at ¶ 37. On April 29, 2015, Dr. Grossman assessed that Reifschneider had a chronic infection and advised irrigation, debridement, and using a vacuum-assisted closure device. *Id.* at ¶ 40. At this point, Reifschneider declined any operative intervention and Dr. Grossman returned him to Columbia Correctional Facility Health Services Unit for further care. *Id.* at ¶ 41. Reifschneider alleges that had Dr. Grossman told him it was necessary to remove the sutures, he would not have declined the surgery. Pl.'s Proposed Findings of Fact (PPFF), ¶ 13, Dkt. No. 86.

Reifschneider later decided he did want an operative intervention for his leg wound. DPFF, ¶ 42. Surgery was scheduled for May 18, 2015. *Id.* However, Reifschneider was hospitalized on May 17, 2015, after he was involved in a prison altercation on that day. *Id.* at ¶ 43. Dr. Grossman did not see Reifschneider again until August 3, 2015. *Id.* at ¶ 44. At this time, he examined Reifschneider's Achilles and saw a wound breakdown near the medial malleolus and determined Reifschneider had a chronic infection. *Id.* at ¶¶ 44–45. Again, Dr. Grossman gave Reifschneider a surgical option using irrigation, debridement, and vacuum-assisted closure device. *Id.* at ¶ 46. Dr. Grossman advised Reifschneider of the surgical risks. *Id.* at ¶ 47. Reifschneider opted to proceed with the surgery. *Id.* at ¶ 47. However, because Reifschneider suffered a closed head injury during the prison altercation, DOC clearance was needed prior to administering anesthesia, which was provided on October 15, 2015. *Id.* at ¶¶ 48–49.

Reifschneider underwent the debridement operation on December 3, 2015. *Id.* at ¶ 51. While Dr. Grossman was operating, he observed that one of the FiberWire sutures (placed during the initial surgery on December 11, 2014) had eroded through the skin where the infection had caused dead tissue. *Id.* at ¶ 52. Dr. Grossman removed the protruding suture during the debridement procedure. *Id.* The other FiberWire sutures, placed during the initial surgery, remain as part of Reifschneider's permanent tendon repair. *Id.* Dr. Grossman did not note any complications from this surgery and advised antibiotic treatment, nonweightbearing, and daily dressing changes. *Id.* at ¶ 54. Reifschneider's wound healed after this surgery. *Id.* at ¶ 55. The December 3, 2015, surgery was the last time Dr. Grossman treated Reifschneider. *Id.*

**LEGAL STANDARD**

Summary judgment is appropriate when the moving party shows that the is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The moving party has the burden of showing that there are no facts to support the nonmoving party's claim. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). All reasonable inferences are construed in favor of the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). Summary judgment is properly entered against a party "who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which that party will bear the burden of proof at trial." *Parent v. Home Depot U.S.A., Inc.*, 694 F.3d 919, 922 (7th Cir. 2012) (internal quotation marks omitted).

**APPOINTMENT OF COUNSEL**

Before addressing the motions on their merits, the court will again address Reifschneider's multiple motions for appointment of counsel in both this case (Dkt. Nos. 23, 37, 45, 57, 104) and in his other case pending before the court, Reifschneider v. Kingsland et al., 18-C-1105 (Dkt. Nos. 17, 29). In his other case, No. 18-C-1105, Reifschneider alleges he was brutally beaten by a correctional officer at Columbia Correctional Institution (CCI) in violation of the Eighth Amendment proscription of cruel and unusual punishment. As a result of the beating, Reifschneider alleges that he suffered head trauma, a nasal fracture, a left hyoid bone fracture, deep lacerations to his scalp, lip and chin, and a right knee injury. The amended complaint alleges that Reifschneider was then transported to the University of Wisconsin Hospital where he was in

a coma for four days. Dkt. No. 15, ¶ 17. Importantly, Reifschneider submitted hospital records which appear to substantiate his allegations as to the severity of his injuries and the fact that he was placed in an induced coma at the University of Wisconsin Hospital.

On September 9, 2019, the court granted Reifschneider's motion for appointment/ recruitment of counsel in both of his cases. Dkt No. 107 in this case and in No. 18-C-1105, Dkt. No. 56. Applying *Pruitt v. Mote*, 503 F.3d 647 (7th Cir. 2007) (*en banc*), the court concluded, upon consideration of Reifschneider's competence and the complexity of the cases, counsel should be recruited. The court was successful in recruiting pro bono counsel for Reifschneider in Case No. 18-C-1105. Within twenty days of the court's order granting Reifschneider's motion, two attorneys from the law firm of Foley & Lardner LLP entered appearances on his behalf, and that case remains pending. The court was unsuccessful, however, in its efforts to recruit counsel in this case. Consistent with the practice in this district upon a finding that counsel should be recruited, the Pro Se Staff Attorneys were directed to try and recruit counsel for Reifschneider in this case. The briefing on Dr. Grossman's motion for summary judgment was stayed pending such recruitment. Another firm initially expressed a willingness to take the case but ultimately concluded it was unable to do so. Unfortunately, after more than two months of efforts by the district's Pro Se Staff Attorneys, including telephone calls to firms and posting the case on the court's website, the court concluded that it was unable to find a pro bono attorney to represent Reifschneider in this case and informed him he would have to do the best he could on his own. Dkt. No. 113. The court suspects that the difficulty in recruiting counsel in this case is likely due to the fact that few of the attorneys who practice in federal court and are willing to represent prisoners pro bono specialize in medical malpractice.

While the court regrets it was unable to recruit counsel for Reifschneider, it is important to note that in 2019 there were 523 pro se prisoner lawsuits filed in the district. According to the Pro Se Staff Attorneys, the court was able to recruit only 33 attorneys to handle prisoner cases pro bono during that same period of time. The Seventh Circuit recently addressed the scarcity of pro bono resources in comparison to the number of cases brought by prisoners in affirming a court's decision not to recruit counsel in the Western District of Wisconsin:

> Finally, in light of the scarcity of volunteer lawyers, the district court was entitled to view the needs of pro se litigants in the district as a whole and to exercise its discretion to determine which cases warranted the outlay of judicial resources in attempting to recruit counsel. . . . As the district court recognized here, almost any pro se litigant would be better off with a lawyer, but that reality is not sufficient to require the court to try to recruit one. In this case, the district court was entitled to conclude that, given the simplicity of Williams's case "among a sea of people lacking counsel," . . . it need not recruit counsel for Williams.

*Williams v. Reyes*, No. 19-1778, 2020 WL 435372, *3 (7th Cir. January 28, 2020); *see also McCaa v. Hamilton*, 893 F.3d 1027, 1036 (7th Cir. 2018) (Hamilton, J., concurring) ("[A] district judge who faces a case like McCaa's must decide whether this particular prisoner-plaintiff, among many deserving and not-so-deserving others, should be the beneficiary of the limited resources of lawyers willing to respond to courts' requests under 28 U.S.C. § 1915(e)(1). In allocating those limited resources, a district judge should be able to make an educated and experienced assessment of how promising the plaintiff's case is, with or without counsel.").

It should also be noted that as the court's decision on the merits reveals, Reifschneider needed more than an attorney to help him; he needed an expert witness to support his claim. Moreover, neither an attorney's time, nor that of an expert, is inexpensive, especially in medical malpractice cases. For this reason, even if he was not serving a state prison sentence, Reifschneider would likely be without legal representation. As the Second Circuit explained more

8

than twenty years ago, in modern courts it is not the size of the typical plaintiff's bank account but the merits of his claim that generally determines whether he or she has attorney representation:

> It is simply not true that the suits of individuals are generally financed by their personal means. Litigation long ago became so expensive that it exceeds the means of all but a tiny fraction of the population. As a general proposition, the availability of counsel for claims by individuals is determined less by the wealth of the claimant than by the merits of the claim. The vast majority of litigation on behalf of personal claimants is financed initially by lawyers who accept the representation for a contingent fee in the expectation of being rewarded by a share of the winnings. In addition to the contingency arrangement, there are statutes, including 42 U.S.C. § 1988, which guarantee pay to a prevailing lawyer at the expense of the adversary. Under these statutes, if the claim will prevail, the lawyer will be well paid without expense to the client, even though the lawsuit may involve only matters of principle without monetary award. Thus, in society at large, it is not so much the comparative wealth of potential claimants that determines whether they can succeed in obtaining the services of counsel, but the likely merits of their claim. If the claim has likely merit, a lawyer can take it with considerable confidence in being reasonably paid—sometimes very well paid.

*Cooper v. A. Sargenti Co., Inc.*, 877 F.2d 170, 173 (2d Cir. 1989).

This is even more true in the medical malpractice area. Because of the time and expense such cases require, and the difficulty of obtaining a favorable verdict, attorneys are reluctant to undertake representation of plaintiffs in such cases absent clear liability and a potential for a large award. Although Reifschneider alleges pain and suffering as a result of the surgery performed by Dr. Grossman, there do not appear to be any hard damages in the form of past and future medical expenses, loss of income, or future care and treatment. In other words, without trying to minimize his claim, Reifschneider is suing for additional pain and suffering resulting from a surgical procedure that he was told could cause him additional pain and suffering. Given the relatively low potential for a substantial verdict assuming liability is established, it is unlikely an attorney who specializes in medical malpractice cases would take Reifschneider's case, even if he was not a state prisoner and even assuming an expert could be found to support his claim. The fact that

9

he is currently serving a sentence for a crime should not ordinarily entitle a person to court-recruited counsel that a similarly situated person who had not committed a crime would lack.

It should also be noted that the court considered appointing an expert under Rule 706 of the Federal Rules of Evidence. *See Rowe v. Gibson*, 798 F.3d 622, 631–32 (7th Cir. 2015) (urging district court on remand to consider appointing a neutral expert witness authorized by Fed. R. Evid. 706 to address medical issues in case brought by state prisoner). Assuming the court could find an expert to support Reifschneider's claim, however, the cost of such expert would have to be borne by Dr. Grossman, since Reifschneider is indigent, and would likely necessitate Dr. Grossman retaining another expert of his own. Not only does it seem unfair and a denial of due process to impose such costs upon the defendant in the absence of any justification, but doing so would likely significantly increase the costs of resolving a case that, for the reasons already noted, reasonable attorneys specializing in the field would not take in any event.

For all of these reasons, and despite the court's conclusion that under *Pruitt* counsel should be recruited, Reifschneider does not have attorney representation. While it considered continuing a stay of proceedings in the hope that counsel would eventually be recruited, the court has concluded that Dr. Grossman is entitled to have the allegations against him resolved without further delay. The court therefore turns to the merits of the motions before it.

**ANALYSIS**

"Under Wisconsin law, medical malpractice has the same ingredients as garden-variety negligence claims: the plaintiff must prove that there was a breach of a duty owed that results in an injury." *Gil v. Reed*, 535 F.3d 551, 557 (7th Cir. 2008). Broken down further, "[a] claim for medical malpractice, as all claims for negligence, requires the following four elements: (1) a breach of (2) a duty owed (3) that results in (4) an injury or injuries, or damages." *Paul v. Skemp*,

2001 WI 42, ¶ 17, 242 Wis. 2d 507, 625 N.W.2d 860. The duty of a doctor is to use the degree of care, skill, and judgment in treating a patient's injury that reasonable doctors who practice in the same area use. *Phelps v. Physicians Ins. Co. of Wis., Inc.*, 2005 WI 85, ¶40, 282 Wis. 2d 69, 698 N.W.2d 643. "In most cases, Wisconsin law requires expert testimony to establish medical negligence, although *res ipsa loquitur* can substitute for expert testimony." *Gil*, 535 F.3d at 557 (first citing *Gil v. Reed*, 381 F.3d 649, 659 (7th Cir. 2004); then citing *Christianson v. Downs*, 90 Wis. 2d 332, 337, 279 N.W.2d 918 (1979); then citing *Richards v. Mendivil*, 200 Wis. 2d 665, 673 n.5, 548 N.W.2d 85 (Ct. App. 1996)).

Reifschneider claims Dr. Grossman committed malpractice by failing to tell Reifschneider that the sutures used in his surgery needed to be removed and would require a second surgery to remove. Dkt. No. 85 at 2–3. He also claims that Dr. Grossman failed to investigate and diagnose the sutures as the cause of his post-surgery infection. Dkt. No. 85 at 2–3. Reifschneider is unable to offer evidence in support of these claims, however, because he did not designate a medical expert. During a deposition on April 18, 2019, Reifschneider acknowledged that he has no medical training, has never been employed in the healthcare field, and is not qualified to provide a medical opinion. Dkt. No. 99-3 at 3. He also admitted that no physician or healthcare provider has told him that what Dr. Grossman did in the surgery he performed on December 11, 2014, or in the care that followed was negligent or fell below the standard of care. *Id.* at 15.

In an effort to overcome the absence of expert testimony in support of his claim, Reifschneider offered several internet articles that he believes support his assertion that Dr. Grossman was negligent in failing to remove the FiberWire sutures that were used to repair his Achilles tendon. Dkt. No. 103-1. As the defense argues, however, the articles are inadmissible hearsay and therefore cannot be considered by the court in deciding the motions for summary

judgment. While it is conceivable that an article could be considered admissible under the learned treatise exception to the hearsay rule, Fed. R. Evid. 803(18), no foundation has been put forth on the record before the court that would support the admission of the articles. As the defense also points out, even if the articles were admitted, they do not support Reifschneider's theory that Dr. Grossman should have removed the FiberWire sutures used to repair his tendon. The articles instead indicate that sutures closing the surgical incision should be removed within ten days to two weeks. That was apparently done, but in any event was not the cause of Reifschneider's difficulty.

Absent an expert opinion, Reifschneider's medical malpractice claim fails, unless *res ipsa loquitur* applies. In a medical malpractice action, a plaintiff may proceed on a *res ipsa loquitur* theory if "(1) there is evidence that the event in question would not ordinarily occur unless there was negligence; (2) the agent or instrumentality that caused the harm was within the defendant's exclusive control; and (3) the evidence allows more than speculation but does not fully explain the event." *Richards*, 200 Wis. 2d at 674 (citing *Fiumefreddo v. McLean*, 174 Wis. 2d 10, 17, 496 N.W.2d 226 (Ct. App. 1993)). The doctrine is meant to apply in place of expert testimony "in situations where the errors were of such a nature that a layperson could conclude from common experience that such mistakes do not happen if the physician had exercised proper skill and care." *Id.* at 673 (citing *McManus v. Donlin*, 23 Wis. 2d 289, 297, 127 N.W.2d 22 (1964)).

However, Reifschneider cannot satisfy the first element of this doctrine. He has not shown that a wound infection would not ordinarily occur after an Achilles tendon repair surgery in the absence of negligence. To the contrary, Reifschneider acknowledged in his deposition that Dr. Grossman informed him that common risks of his surgery included bleeding, infection, nerve and blood vessel damage, swelling, scars, stiffness, and the need for additional intervention. Dkt. No.

99-3 at 13–14. Reifschneider's admission shows that he was informed that the type of complications he suffered may ordinarily result from Achilles tendon repair surgery where there was no negligence. This admission defeats his ability to proceed under a *res ipsa loquitur* theory.

Reifschneider has also failed to show that Grossman did not attain "informed consent." Dkt. No. 85 at 2–3. Under Wisconsin's informed consent law, a physician's duty to inform does not require the disclosure of any risks "apparent or known to the patient." Wis. Stat. § 448.30(3). Not only has Reifschneider admitted that Grossman informed him about the risks of his surgery, Reifschneider later admits, in a supplemental surresponse, that "Dr. Grossman may be correct in stating that the FiberWire was made to be a permanent part of the repair." Dkt. No. 111 at 1. As Reifschneider now admits that the sutures were intended to be permanent, he has no basis to claim that Dr. Grossman failed to inform him that they needed to be removed soon after surgery. His other allegations about the sutures fail for the same reasons his state law malpractice claim fails– he has not provided expert testimony or evidence to otherwise proceed on a *res ipsa loquitur* theory.

## CONCLUSION

For the foregoing reasons, Dr. Grossman's motion (Dkt. No. 95) for summary judgment will be **GRANTED** and Reifschneider's motion (Dkt. No. 84) for summary judgment will be **DENIED**. The court also **DENIES** Reifschneider's motion (Dkt. No. 109) for the court to substitute his findings of fact or grant him an extension to do so. The court will withhold judgment until the remaining claims are resolved.

**SO ORDERED** at Green Bay, Wisconsin this 16th day of March, 2020.

s/ William C. Griesbach
William C. Griesbach, District Judge
United States District Court