UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ROBERT REIFSCHNEIDER,

        Plaintiff,

    v.                                Case No. 18-C-146

DR. THOMAS GROSSMAN,
MEREDITH BIRD,
DR. KARL HOFFMANN,
DR. SALAM SYED,
TRISHA ANDERSON,
JEAN JONES, and
RACHEL PAFFORD,

        Defendants.

## DECISION AND ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Robert Reifschneider, who is incarcerated at the Wisconsin Secure Program Facility and representing himself, filed this action pursuant to 42 U.S.C. § 1983, alleging that his civil rights were violated while he was housed at Columbia Correctional Institution. In particular, Plaintiff asserts that Defendants Meredith Bird Spangler, Dr. Karl Hoffmann, Dr. Salam Syed, Trisha Anderson, Jean Jones, and Rachel Pafford were deliberately indifferent to his serious medical needs. In addition to his federal claims under § 1983, Plaintiff also asserted a state medical malpractice claim against Dr. Grossman, Dr. Hoffmann, and Dr. Syed over which the court exercised supplemental jurisdiction under 28 U.S.C. § 1367, since it appeared that the claim was intertwined with the other claims in the action. On March 16, 2020, the court granted Dr. Grossman's motion for summary judgment. Presently before the court is the State Defendants'

motion for summary judgment. For the reasons that follow, Defendants' motion for summary judgment will be granted and the case will be dismissed.

**PRELIMINARY MATTERS**

Plaintiff has filed a motion for reconsideration, requesting that the court reconsider its decision to require Plaintiff to prosecute this action without counsel. On September 9, 2019, the court granted Plaintiff's motion for recruitment of counsel in both of his cases, Case No. 18-C-1105 and Case No. 18-146. Applying *Pruitt v. Mote*, 503 F.3d 647 (7th Cir. 2007) (en banc), the court concluded upon consideration of Plaintiff's competence and the complexity of the case that counsel should be recruited. The court was successful in recruiting pro bono counsel for Plaintiff in Case No. 18-C-1105. Within twenty days of the court's order granting Plaintiff's motion, two attorneys from the law firm of Foley & Lardner LLP entered appearances on his behalf, and that case remains pending. The court was unsuccessful, however, in its efforts to recruit counsel in this case. Consistent with the practice in this district upon a finding that counsel should be recruited, the Pro Se Staff Attorneys were directed to try and recruit counsel for Plaintiff in this case, and briefing was stayed pending such recruitment. Another firm initially expressed a willingness to take the case but ultimately concluded it was unable to do so. Unfortunately, after more than two months of efforts by the district's Pro Se Staff Attorneys, the court concluded it was unable to find a pro bono attorney to represent Plaintiff in this case and informed Plaintiff that he would have to do the best he could on his own. Dkt. No. 113. Plaintiff requests that the court reconsider that decision.

Civil litigants do not have a constitutional or statutory right to have an attorney represent them. *Jackson v. Cty. of McLean*, 953 F.2d 1070, 1071 (7th Cir. 1992) ("We begin with the fundamental premise that indigent civil litigants have no constitutional or statutory right to be

2

represented by counsel in federal court."). District courts have the discretion to recruit counsel for individuals unable to afford counsel in appropriate cases pursuant to 28 U.S.C. § 1915(e)(1). *Navejar v. Iyola*, 718 F.3d 692, 696 (7th Cir. 2013). "[D]eciding whether to recruit counsel 'is a difficult decision: Almost everyone would benefit from having a lawyer, but there are too many indigent litigants and too few lawyers willing and able to volunteer for these cases.'" *Henderson v. Ghosh*, 755 F.3d 559, 564 (7th Cir. 2014) (quoting *Olson v. Morgan*, 750 F.3d 708, 711 (7th Cir. 2014)). In exercising its discretion, the court must consider two things: "(1) 'has the indigent plaintiff made a reasonable attempt to obtain counsel or been effectively precluded from doing so,' and (2) 'given the difficulty of the case, does the plaintiff appear competent to litigate it himself?'" *Pennewell v. Parish*, 923 F.3d 486, 490 (7th Cir. 2019) (quoting *Pruitt v. Mote*, 503 F.3d 647, 653 (7th Cir. 2007)). But these are not the only factors that the court may consider in deciding whether to undertake the effort to recruit counsel.

The Seventh Circuit recently stated that the decision to recruit counsel is also "informed by the realities of recruiting counsel in the district." *See McCaa v. Hamilton*, 959 F.3d 842, 845 (7th Cir. 2020). Noting the difficulties district courts face in recruiting pro bono counsel to devote the time, effort, and likely expense required to represent a prisoner from discovery through jury trial, the court explained:

> District courts are thus inevitably in the business of rationing a limited supply of free lawyer time. Nothing in *Pruitt* or our other cases on recruiting counsel prohibits a judge from using available information and the judge's experience to assess the importance and potential merits of the case and to assign priority accordingly. A judge might reasonably decide to give priority to a prisoner who makes a plausible claim that necessary surgery is being delayed unreasonably over another prisoner's claim that a much less serious condition was ignored.

*Id.*; *see also William v. Reyes*, 800 F. App'x 440, 443–44 (7th Cir. 2020) ("[I]n light of the scarcity of volunteer lawyers, the district court was entitled to view the needs of pro se litigants in the

3

district as a whole and to exercise its discretion to determine which cases warranted the outlay of judicial resources in attempting to recruit counsel." (citation omitted)). In other words, the court must decide on a case-by-case basis whether a particular plaintiff should benefit from the limited resources of lawyers willing to represent a pro se litigant at the court's request. As the court explained in its March 16, 2020 Decision and Order granting Dr. Grossman's motion for summary judgment, while the court regrets it was unable to recruit counsel for Plaintiff, it is important to note that in 2019 there were 523 pro se prisoner lawsuits filed in the district. According to the Pro Se Staff Attorneys, the court was able to recruit only 33 attorneys to handle prisoner cases pro bono during that same period of time.

Given the difficulty of recruiting counsel in this district and for the reasons explained in the court's March 16, 2020 Decision and Order, despite the court's conclusion that under *Pruitt* counsel should be recruited, Plaintiff does not have attorney representation. While the court considered continuing a stay of proceedings in the hope that counsel would eventually be recruited, the court has concluded that the defendants are entitled to have the allegations against them resolved without further delay. Therefore, Plaintiff's motion for reconsideration is denied.

In addition, Plaintiff moved to stay the case so that he can appeal the court's decision granting Dr. Grossman's motion for summary judgment. Because that decision was not a final order resolving the case in its entirety, an appeal would be inappropriate at this time. Plaintiff also moved for a stay so that he could obtain additional evidence to support his claims and moved for reconsideration of the court's order denying his request to extend discovery. Discovery in this case closed in August 2019, and discovery had been open for more than one year. Since the filing of his motions, Plaintiff was able to properly respond to Defendants' proposed findings of fact and cite specific references to the record to support his disagreement. The court will not reopen

4

discovery or stay the case to allow Plaintiff to obtain additional evidence. Finally, Plaintiff has requested that this case be stayed until his second case, Case No. 18-C-1105, is resolved. The court finds that a stay on this basis would be inappropriate. This case is unrelated to Plaintiff's other case, as there are no overlapping issues. In short, a stay is not warranted. Therefore, Plaintiff's motions for a stay and reconsideration are denied.

## BACKGROUND

Plaintiff was an inmate in custody at Columbia Correctional Institution at all times relevant to this matter. Defs.' Proposed Findings of Fact (DPFOF) ¶ 1, Dkt. No. 122. The Department of Corrections employed Meredith Bird Spangler (Mashak) as the Health Services Unit (HSU) Manager; Karl Hoffmann and Salam Syed as physicians; and Trisha Anderson, Jean Jones, and Rachel Pafford as nurses. *Id.* ¶¶ 2–5, 7–8. Pafford was a member of HSU staff and assisted in scheduling medical appointments. *Id.* ¶ 6. She did not provide medical care. *Id.*

On December 8, 2014, Dr. Grossman diagnosed Plaintiff as having an Achilles tendon tear while Plaintiff was housed at Dodge Correctional Institution. *Id.* ¶ 9. On December 11, 2014, Dr. Grossman repaired Plaintiff's Achilles tendon without complication. *Id.* ¶ 10. Plaintiff saw Dr. Grossman for a postoperative appointment on December 22, 2014. Dr. Grossman noted that Plaintiff's surgery incision was benign, applied a short leg cast on Plaintiff, and reviewed with Plaintiff the possibility of damage to nerves and blood vessels. Dr. Grossman intended to wait one year before attempting to determine the nature of any permanency. *Id.* ¶ 11.

Plaintiff was transferred from Dodge to Columbia Correctional Institution on January 20, 2015. *Id.* ¶ 12. On February 12, 2015, Plaintiff presented to a doctor's appointment with Dr. Grossman. *Id.* ¶ 13. At the appointment, Dr. Grossman noted that the surgical incision remained benign and that Plaintiff had normal sensory examination distally. Plaintiff reported some

5

dysesthesias in the lateral plantar aspect of the foot, which Dr. Grossman assessed as possible neuropathic pain. Dr. Grossman recommended that Plaintiff be provided pain reliever, an Achilles post-op boot, and physical therapy and that Plaintiff return to see him in eight weeks. *Id.* ¶ 14.

On February 26, 2015, Dr. Hoffmann saw Plaintiff for an acute change in his right Achilles tendon repair and increased pain. Plaintiff reported that he felt that his "tendon had snapped." *Id.* ¶ 15. Dr. Hoffmann prescribed Gabapentin for Plaintiff and instructed Plaintiff to follow up with Dr. Grossman. *Id.* ¶ 16. On March 2, 2015, Dr. Hoffmann recommended a physical therapy consult to improve Plaintiff's range of motion and strengthening. *Id.* ¶ 17. He also instructed Plaintiff to gradually decrease his wedges in his Achilles boot to assist in his foot and ankle rehabilitation. *Id.* ¶ 18. On March 5, 2015, Plaintiff presented to an appointment with Dr. Hoffmann for his Achilles tendon tear and possible cellulitis. Dr. Hoffmann prescribed Bactrim and called Dr. Grossman, who would see Plaintiff the following week. *Id.* ¶¶ 19–20. In order to assist Plaintiff in the interim, Dr. Hoffmann recommended that Plaintiff use Tylenol with codeine for pain relief, ice, elevation, and maximum wedges for the Achilles boot. *Id.* ¶ 20.

On March 11, 2015, Dr. Grossman saw Plaintiff again. Plaintiff reported that the wound was dramatically better. Dr. Grossman examined Plaintiff's wound and concluded that the wound was infected but responded to initial conservative measures. Dr. Grossman continued Plaintiff on Bactrim and recommended that Plaintiff return in two weeks. *Id.* ¶ 21. Later that day, Plaintiff also saw Dr. Hoffmann. Dr. Hoffmann instructed Plaintiff to change his dressing and to follow up with Dr. Grossman. *Id.* ¶ 22. The next day, on March 12, 2015, Dr. Hoffmann discontinued the Tylenol with codeine because Plaintiff stated he no longer needed it for his pain. *Id.* ¶ 23.

On March 25, 2015, Plaintiff saw Dr. Grossman. At the appointment, Plaintiff reported some bleeding in the area of his surgical wound. Dr. Grossman diagnosed the presence of

6

granulation tissue and recommended the initiation of silver nitrate treatment; that Plaintiff start dry dressings, to be changed as required; and Neurontin for the treatment of any neuropathic pain. *Id.* ¶ 24.

On April 1, 2015, Dr. Syed called Dr. Grossman about possibly obtaining a skin graft for Plaintiff. Dr. Grossman stated they should wait for now and keep monitoring Plaintiff. He noted that Plaintiff had good granulation tissue, or new connective tissue. Dr. Grossman indicated that Plaintiff should not be provided additional narcotics because the more narcotics he received, the more his wound would not heal. *Id.* ¶ 25.

On April 20, 2015, Plaintiff was seen for reoccurring infection in his Achilles tendon repair. Dr. Hoffmann prescribed Bactrim for the infection and Tylenol with codeine for his pain. *Id.* ¶ 26. He also urgently recommended a follow up visit with Dr. Grossman for the possible infection and abscess near the surgical site for his Achilles tendon repair. Although Dr. Hoffmann addressed Plaintiff's medical concerns pertaining to his Achilles tendon repair and infection, he referred Plaintiff to Dr. Grossman, who provided Plaintiff with postoperative surgical care and treatment. *Id.* ¶ 27. Plaintiff was also ordered Tylenol 3 again, because his infection reoccurred. Two days later, the medication was discontinued because a nurse believed Plaintiff misused prescription narcotics. *Id.* ¶ 28. Plaintiff denies misusing his medication.

On April 28, 2015, Dr. Grossman examined Plaintiff and diagnosed him with a chronic infection. *Id.* ¶ 29. He recommended a surgical procedure to fix the infections, specifically irrigation, debridement, and the application of a vacuum-assisted closure device. Plaintiff stated he did not wish to have surgery to repair his infection at that time. Dr. Grossman returned Plaintiff to Columbia for further management, with no further recommendations. *Id.* ¶ 30.

7

Plaintiff informed Dr. Hoffmann on May 5, 2015, that he initially refused surgery because Dr. Grossman had recommended to fix the infections but changed his mind and decided to proceed with the surgery. *Id.* ¶ 31. Dr. Hoffmann then referred Plaintiff back to Dr. Grossman to schedule the surgery as soon as possible. Dr. Grossman's office scheduled the surgery for May 18, 2015. *Id.* ¶ 32.

On May 17, 2015, Plaintiff was involved in an altercation that severely injured his head and throat. *Id.* ¶ 33. He was hospitalized for his injuries from May 17, 2015, to May 22, 2015. *Id.* ¶ 34. As a result, Dr. Grossman canceled Plaintiff's surgery. *Id.* ¶ 35. From May 17, 2015, to October 15, 2015, Plaintiff was unfit for his second surgery due to his injuries. *Id.* ¶ 36. On May 28, 2015, Dr. Hoffmann prescribed Bactrim DS twice a day to address Plaintiff's infection and discussed his concern to be safely intubated for his second surgery. *Id.* ¶ 37. On June 7, 2015, Plaintiff submitted a Health Services Request (HSR) requesting more dressing and tape, his probiotic, and his Vitamin C medication. HSU staff promptly responded by forwarding the items and medication to Plaintiff on June 3 and June 8, 2015. *Id.* ¶ 39.

Plaintiff underwent a CT scan to determine whether it was safe to intubate him if needed for surgery. On June 9, 2015, a UW doctor reviewed the results of the CT scan and determined there was healing of the fracture and the nasal septal hemotoma was resolved. *Id.* ¶ 40. On June 17, 2015, Plaintiff submitted an HSR regarding the scheduling of his surgery. Anderson informed him that the physician needed to discuss his results before scheduling his surgery, and an appointment with the physician was already scheduled. Nurses and HSU staff cannot schedule surgery without the physician authorizing the surgery. *Id.* ¶ 41.

Later that day, Dr. Syed put in an order to see Plaintiff, as he had not been seen since his return, and noted that Plaintiff needed a follow up with Dr. Grossman. Plaintiff saw Dr. Hoffmann

8

on June 18, 2015. *Id.* ¶ 42. Plaintiff was seen by nursing staff on June 26, 2015. *Id.* ¶ 43. On July 2, 2015, Plaintiff submitted an HSR regarding a recommendation that he be provided Bactrim. Pafford responded that the Department of Corrections has discretion regarding recommendations from physicians outside of the Department's network of physicians. Neither nurses nor HSU staff have the authority to request or give permission for a patient to be seen by an outside provider. *Id.* ¶ 44. Also that day, Plaintiff saw Dr. Syed, who requested that Plaintiff be scheduled for a follow up with Dr. Grossman to further plan for surgery. *Id.* ¶ 45.

On July 14, 2015, Plaintiff submitted an HSR inquiring about the surgery schedule for his tendon. HSU staff informed Plaintiff that his appointment would be scheduled soon. Scheduling appointments and surgeries are prioritized based on the medical needs of all patients at the Institution who are requesting to be seen at HSU. *Id.* ¶ 46.

On August 3, 2015, Dr. Grossman saw Plaintiff. He again assessed a chronic infection of Plaintiff's surgical wound and recommended surgery to repair the infection. Plaintiff agreed to have surgery. *Id.* ¶ 47. But Plaintiff could not undergo surgery until he was cleared for the administration of anesthesia following his injuries from the May 17, 2015 altercation. *Id.* ¶ 48. On August 17, 2015, Plaintiff submitted an HSR regarding his leg pain and scheduling his surgery. Bird Spangler responded clarifying that Dr. Syed ordered Plaintiff to go to ENT to be cleared for general anesthesia, so no surgery was scheduled, but noted that it would be scheduled soon. Bird Spangler did not have the authority or the qualifications to clear Plaintiff for surgery and needed to have a doctor submit a recommendation. *Id.* ¶ 49. On August 19, 2015, Plaintiff submitted an HSR asking to be seen as soon as possible because he felt his treatment was being delayed. HSU staff assured Plaintiff that there was no delay, as it takes time to process and schedule appointments. Plaintiff's concerns were noted, and Plaintiff would be scheduled at the earliest

9

possible opening. *Id.* ¶ 50. On September 21, 2015, Plaintiff submitted an HSR requesting to know the results of his MRI. He submitted another HSR the same day regarding the status of an appointment. HSU staff responded to both requests that he was already scheduled to be seen at HSU. *Id.* ¶ 51.

On October 12 and 13, 2015, Plaintiff submitted HSRs regarding his wait to be seen after being discharged from UW Hospital. HSU staff responded that he was being scheduled. *Id.* ¶ 52. Dr. Timothy McCullech cleared Plaintiff for intubation on October 14, 2015. Therefore, Plaintiff was cleared for general anesthesia. *Id.* ¶ 54. On December 3, 2015, Dr. Grossman performed surgery on Plaintiff to debride his right lower extremity and to apply a vacuum-assisted closure device. Dr. Grossman noted no complications during the surgery. *Id.* ¶ 55.

Plaintiff filed three inmate complaints that were accepted by the Institution under the Inmate Complaint Review System relating to his Achilles tendon issue. *Id.* ¶ 56. He filed his first inmate complaint, CCI-2015-11712, on June 13, 2015, complaining that correctional officer Colman (not a defendant) refused to provide him with bandages for his wound. *Id.* ¶ 57. The inmate complaint examiner determined Plaintiff did not attempt to informally resolve the issue and dismissed the inmate complaint. Plaintiff did not appeal the dismissal. *Id.* ¶ 58.

Plaintiff filed his second inmate complaint, CCI-2015-13560, on July 14, 2015, complaining about Dr. Grossman. Plaintiff stated, "I would like to file a complaint on the surgeon who did surgery on my Achilles tendon on my right leg. I got infected so bad stitches come out of my left and has been infected for a long time." *Id.* ¶ 59. The inmate complaint examiner rejected the inmate complaint because it related to an outside provider and was not within the scope of the inmate complaint review system. *Id.* ¶ 60.

Plaintiff filed his final inmate complaint about his Achilles tendon, CCI-2015-13559, on or about July 24, 2015, stating that the inmate complaint examiner returned an inmate complaint because he did not list the date of the incident and did not attempt to informally resolve the matter with Bird Spangler. Plaintiff noted he corrected those errors and requested that his earlier complaint be received. *Id.* ¶ 61. The inmate complaint examiner responded by reviewing the earlier submitted inmate complaint. In that complaint, Plaintiff stated he was not provided a boot and wanted the second surgery on his foot as soon as possible. *Id.* ¶ 62. The inmate complaint examiner reviewed Plaintiff's medical records, spoke with Bird Spangler, determined that Plaintiff's concern was being addressed, and dismissed Plaintiff's inmate complaint. *Id.* ¶ 63. On September 8, 2015, Plaintiff appealed the dismissal of his inmate complaint. *Id.* ¶ 64. The appeal was reviewed and dismissed. *Id.* ¶ 65.

## LEGAL STANDARD

Summary judgment is appropriate when the moving party shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In deciding a motion for summary judgment, the court must view the evidence and make all reasonable inferences that favor them in the light most favorable to the non-moving party. *Johnson v. Advocate Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) (citing *Parker v. Four Seasons Hotels, Ltd.*, 845 F.3d 807, 812 (7th Cir. 2017)). The party opposing the motion for summary judgment must "submit evidentiary materials that set forth specific facts showing that there is a genuine issue for trial." *Siegel v. Shell Oil Co.*, 612 F.3d 932, 937 (7th Cir. 2010) (citations omitted). "The nonmoving party must do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* Summary judgment is properly entered against a party "who fails to make a showing to establish the existence of an element essential to

11

the party's case, and on which that party will bear the burden of proof at trial." *Austin v. Walgreen Co.*, 885 F.3d 1085, 1087–88 (7th Cir. 2018) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

## ANALYSIS

### A. Failure to Exhaust Administrative Remedies

As an initial matter, Defendants assert that Plaintiff has failed to exhaust his administrative remedies for several claims. The PLRA provides that an inmate cannot assert a cause of action under federal law "until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(1); *see also Woodford v. Ngo*, 548 U.S. 81, 93 (2006) (holding that the PLRA requires proper exhaustion of administrative remedies). Exhaustion requires that an inmate comply with the rules applicable to the grievance process at the inmate's institution. *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002). A plaintiff's failure to properly exhaust each step of the administrative process constitutes a failure to exhaust available administrative remedies. *Id.* The exhaustion requirement "applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 526, 532 (2002). The purpose of § 1997e(a) is to "permit the prison's administrative process to run its course before litigation begins." *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006) (quoting *Cannon v. Washington*, 418 F.3d 714, 719 (7th Cir. 2005)); *see also Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006).

Wisconsin has implemented the Inmate Complaint Review System (ICRS). *See* Wis. Admin. Code ch. DOC 310. On April 1, 2018, the Department of Corrections promulgated new rules replacing Wis. Admin. Code chapter DOC 310. The court will cite to the version of chapter DOC 310 that was in effect at the time material to Plaintiff's complaint. The ICRS allows inmates

to "raise significant issues regarding rules, living conditions, staff actions affecting institution environment, and civil rights complaints." Wis. Admin. Code § DOC 310.08(1). Under the ICRS, an inmate must file a complaint with the institutional complaint examiner (ICE) within 14 calendar days after the events giving rise to the complaint occur, unless good cause exists to excuse a delay. *Id.* § DOC 310.09(6). The ICE has the authority to return, investigate, or reject the complaint. *Id.* § DOC 310.07(2). If a reviewing authority renders a decision, the inmate may appeal the rejection of the complaint to the appropriate reviewing authority within 10 calendar days. *Id.* § DOC 310.13(1). After reviewing an appeal, the CCE recommends a decision to the DOC Secretary, who adopts or rejects the recommendation. *Id.* §§ DOC 310.13; DOC 310.14. The failure to properly exhaust each step of the grievance process before filing a lawsuit constitutes a failure to exhaust administrative remedies. *Pozo*, 286 F.3d at 1025.

Defendants assert that Plaintiff did not exhaust his administrative remedies because he did not file inmate complaints regarding the medical care he received before May 23, 2015; against Dr. Syed for taking Plaintiff off pain medications and refusing to see him on at least one occasion; and against Bird Spangler for understaffing the HSU. Plaintiff does not dispute that he did not exhaust his administrative remedies on these claims. Instead, he asserts that the administrative process was unavailable to him because "he made it very clear to the complaint staff that he had no idea how to properly file a complaint, and that the process confused him." Dkt. No. 140 at 7. The Seventh Circuit has recognized that, "[i]f administrative remedies are not 'available' to an inmate, then an inmate cannot be required to exhaust." *Kaba*, 458 F.3d at 684. In this case, the record demonstrates that the complaint office provided Plaintiff with information on how to properly exhaust administrative remedies. In addition, Plaintiff had properly filed, appealed, and

13

fully exhausted other grievances, including grievances concerning other issues in this lawsuit. In short, the administrative remedies process was not unavailable to Plaintiff.

Plaintiff also argues that his claims should not be dismissed based on his failure to exhaust his administrative remedies because Defendants had notice of his claims since he filed "about a hundred complaints with medical staff at the Health Service Unit." Dkt. No. 140 at 7. To find that an inmate has complied with exhaustion requirements merely because the defendants should have known about his complaints would allow prisoners to bypass the administrative remedy process, thereby defeating the policy objectives of requiring exhaustion in the first place. The Seventh Circuit has held that a plaintiff's failure to properly exhaust each step of the administrative process constitutes a failure to exhaust available administrative remedies. *Pozo*, 286 F.3d at 1025. Because the grievance process was available to Plaintiff and he did not properly exhaust his claims regarding the medical care he received before May 23, 2015; against Dr. Syed for taking Plaintiff off pain medications and refusing to see him on at least one occasion; and against Bird Spangler for understaffing the HSU prior to filing suit, Defendants are entitled to summary judgment on these claims.

### B. Plaintiff's Deliberate Indifference Claims

Plaintiff claims Defendants were deliberately indifferent to his serious medical needs. In particular, Plaintiff asserts that Drs. Hoffmann and Syed delayed Plaintiff's second surgery to repair his infected Achilles tendon surgery wound; Bird Spangler made no effort to expedite Plaintiff's second surgery; Nurses Anderson and Jones failed to timely address his complaints of pain and requests for care; and Pafford improperly denied Plaintiff his antibiotics. The Eighth Amendment prohibits "cruel and unusual punishments." U.S. Const. amend. VIII. It imposes a duty on prison officials to take reasonable measures to guarantee an inmate's safety and to ensure

that inmates receive adequate medical care. *Farmer v. Brennan*, 511 U.S. 825, 832 (1994). A prison official's "deliberate indifference" to a prisoner's medical needs or to a substantial risk of serious harm violates the Eighth Amendment. *Id.* at 828; *see also Estelle v. Gamble*, 429 U.S. 97, 104–05 (1976). This does not mean, however, that every claim by a prisoner that he has not received adequate medical treatment states a violation of the Eighth Amendment. To prove a claim of deliberate indifference, the plaintiff must "establish that [he] suffered from an 'objectively serous medical condition' and that the 'defendant was deliberately indifferent to that condition.'" *Wilson v. Adams*, 901 F.3d 816, 820 (7th Cir. 2018) (quoting *Petties v. Carter*, 836 F.3d 722, 728 (7th Cir. 2016)).

Defendants assert that Plaintiff has not shown that they were deliberately indifferent to an objectively serious medical condition. Deliberate indifference requires more than negligence or even gross negligence; it requires that the defendant knew of, yet disregarded, an excessive risk to the plaintiff's safety. *Farmer*, 511 U.S. at 825, 837; *see also Estelle*, 429 U.S. at 104. It is not enough to show that prison officials merely failed to act reasonably. *Gibbs v. Franklin*, 49 F.3d 1206, 1208 (7th Cir. 1995). "[D]eliberate indifference may be inferred based upon a medical professional's erroneous treatment only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment." *Estate of Cole by Pardue v. Fromm*, 94 F.3d 254, 261–62 (7th Cir. 1996).

Addressing Plaintiff's claims against Drs. Hoffmann and Syed first, the record demonstrates that these defendants were anything but deliberately indifferent to Plaintiff's medical needs. Drs. Syed and Hoffmann appropriately treated and cared for Plaintiff during numerous appointments following Plaintiff's Achilles tendon surgery. Dr. Hoffmann prescribed Plaintiff

15

with pain medication and scheduled Plaintiff for numerous follow-up visits with Dr. Grossman. He also scheduled Plaintiff for physical therapy and instructed Plaintiff on how to rehabilitate his ankle. After Plaintiff's wound became infected, Dr. Hoffmann prescribed antibiotics and referred Plaintiff to Dr. Grossman. When Plaintiff decided he wanted a second surgery, Dr. Hoffmann referred Plaintiff to Dr. Grossman for the surgery, and the surgery was scheduled. After Plaintiff was involved in an altercation that severely injured his head and throat the day before the scheduled surgery, Drs. Hoffmann and Syed provided proper care while Plaintiff healed for the second surgery. In particular, Dr. Hoffmann discussed his concern surrounding Plaintiff's recovery before proceeding with the second surgery and continued to prescribe Plaintiff antibiotics. Plaintiff also continued to see Dr. Grossman to assess the wound and discuss surgery. After a doctor cleared Plaintiff for surgery in October 2015, Plaintiff ultimately underwent surgery in December 2015. Plaintiff asserts that Dr. Hoffmann would only prescribe antibiotics for ten days at a time, even though Dr. Grossman wanted Plaintiff on antibiotics continually. Even if true, Plaintiff does not demonstrate that Dr. Hoffmann's treatment decisions were inappropriate. Plaintiff's disagreement with the physicians' treatment decisions does not amount to deliberate indifference. *See Snipes v. DeTella*, 95 F.3d 586, 591 (7th Cir. 1996). Drs. Hoffmann and Syed provided frequent and ongoing care to Plaintiff. Any delays Plaintiff experienced in receiving surgery were the result of Plaintiff's injury to his throat. In sum, Drs. Hoffmann and Syed were not deliberately indifferent to Plaintiff's medical needs.

Plaintiff asserts that Bird Spangler was deliberately indifferent when she made no effort to expedite his second surgery and that Nurses Anderson and Jones failed to timely address his complaints of pain and requests for care. Plaintiff has not presented evidence that these defendants acted with any culpable state of mind. Bird Spangler did not have the authority to clear Plaintiff

16

for surgery or schedule the surgery. Each time Plaintiff contacted Bird Spangler inquiring about his surgery schedule, she timely responded to his inquiries and stated that he would be scheduled to see medical staff. In addition, the nurses did not have the authority to schedule the surgery until Plaintiff was cleared for surgery by a physician. They quickly and properly responded to Plaintiff's requests for a second surgery and indicated that Plaintiff was scheduled to see a physician. Again, any delay in clearing Plaintiff for surgery was caused by Plaintiff's neck injury, not Nurse Anderson or Nurse Jones' conduct. Plaintiff has not presented evidence sufficient for a reasonable juror to conclude that the actions of Bird Spangler, Nurse Anderson, and Nurse Jones were objectively unreasonable; therefore, summary judgment will be granted in their favor. *See Turner v. Paul*, 953 F.3d 1011, 1015 (7th Cir. 2020).

Finally, Plaintiff argues that Pafford was deliberately indifferent to his serious medical needs because she improperly denied Plaintiff his antibiotics. But Pafford did not deny Plaintiff's prescription for Bactrim. Instead, she promptly responded to Plaintiff's HSR requesting Bactrim by indicating that recommendations from outside doctors may or may not be followed by the Institution. Pafford did not have the authority to provide medical care and had no authority to decide how Plaintiff was to be treated. Plaintiff has not established that Pafford was deliberately indifferent to Plaintiff's serious medical needs. Therefore, Defendants' motion for summary judgment with respect to Plaintiff's deliberate indifference claim will be granted.

### C. Plaintiff's State Law Claims

Plaintiff has asserted medical malpractice claims under Wisconsin law. Generally, when federal claims drop out of a case, federal courts decline to exercise supplemental jurisdiction over state law claims. 28 U.S.C. § 1367(c)(3); *see Carlsbad Tech. Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639 (2009) ("A district court's decision whether to exercise [supplemental] jurisdiction after

17

Case 2:18-cv-00146-WCG   Filed 08/25/20   Page 17 of 18   Document 151

dismissing every claim over which it had original jurisdiction is purely discretionary."). The Seventh Circuit has described a "sensible presumption that if the federal claims drop out *before trial*, the district court should relinquish jurisdiction over the state-law claims." *Williams Elecs. Games, Inc. v. Garrity*, 479 F.3d 904, 907 (7th Cir. 2007). The court follows this presumption and declines to exercise supplemental jurisdiction over Plaintiff's state law claims. Plaintiff's state law claims will therefore be dismissed without prejudice so that they may be pursued in a state forum.

## CONCLUSION

For these reasons, Defendants' motion for summary judgment (Dkt. No. 116) is **GRANTED**. Plaintiff's exhausted federal claims are dismissed with prejudice, and his unexhausted claims and state law claims against the State Defendants are dismissed without prejudice. Plaintiff's motion for leave to file a sur-reply (Dkt. No. 148) is **GRANTED**. The Clerk is directed to detach and e-file the sur-reply (Dkt. No. 148-1). Plaintiff's motions to stay (Dkt. Nos. 129, 130, 145) and motions for reconsideration (Dkt. Nos. 131, 137) are **DENIED**. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin this 25th day of August, 2020.

s/ William C. Griesbach
William C. Griesbach
United States District Judge